PEOPLE *v.* CASEY.

124   279
f124   620
124   279
s82NW 883
124   279
134  1 59
124   279
136  1197

1. CRIMINAL LAW—DEFENSES—INSANITY—NONEXPERT WITNESSES.
   In support of a defense of insanity on a criminal prosecution, witnesses who testify to an acquaintance with the accused, and to unusual actions tending to show insanity observed by them, are competent to express the opinion, based on such observations, that the accused was insane.

2. SAME—WITNESSES—INDORSEMENT ON INFORMATION.
   Under 3 Comp. Laws 1897, § 11934, requiring the names of witnesses known to the prosecutor to be indorsed on the information at the time of filing, it was error to permit the people to swear a witness in rebuttal whose name was not so indorsed, where no showing was made that the name of such witness, or the materiality of his testimony, was theretofore unknown to the prosecutor.

Error to Alpena; Kelley, J. Submitted May 1, 1900. Decided May 18, 1900.

Maurice E. Casey was convicted of an assault with intent to commit the crime of murder, and sentenced to imprisonment for 25 years in the State prison at Marquette. Reversed.

*James Collins* and *Charles D'Aigle* (*J. D. Turnbull*, of counsel), for appellant.

*J. H. Cobb*, Prosecuting Attorney, for the people.

MOORE, J. Respondent was charged and convicted of assault with the intent to commit the crime of murder, and sentenced to Marquette prison for 25 years. Respondent and his wife lived unhappily together during most of their married life, and at the time the crime was committed were living apart. They had two children, both of whom were boys. The younger boy lived with his father, on Lockwood street; the older boy and Mrs.

Casey, with Mrs. Casey's mother and sister, on Plains street, in the city of Alpena. On Sunday, the 19th day of December, 1897, the boy Freddie called to see his mother and brother. Later, respondent was seen by Eliza Sheridan and Mrs. Casey approaching the house. They supposed he had come for Freddie, who was playing in the yard. Mrs. Casey told her sister to put Freddie's overcoat on him outside the house, so respondent would have no excuse to come in the house. As respondent came up the steps, Miss Sheridan said to him, "Here, Freddie is ready;" and he said, "Get the whisk and brush the snow off that child." Respondent then came up the steps, and pushed past her into the house. This was at the back kitchen door. Witness and the boy followed respondent into the house. Mrs. Casey was washing dishes, and stood almost behind the kitchen door. Respondent went up to her and said, " I will give you until Monday to get out of town." She asked him what she had got to get out of town for. Respondent then pointed a revolver at her face and fired. The shot took effect under the right eye. Miss Sheridan ran to the front door to call help, and, while away, respondent shot his wife through the elbow. Miss Sheridan returned to the kitchen, where respondent pointed the gun at her. She said, "For God's sake, Maurice, don't shoot me." In the meantime Mrs. Casey had crawled under the table. Respondent then fired two more shots at his wife, and attempted to fire the third, but the gun did not go off. Respondent took his child and walked away. He was later found in a cellar just outside the city, and arrested. The defense was insanity, and the case is brought here for review upon writ of error. There were a number of assignments of error, but we shall discuss only those we deem important.

On the part of the defense, Mr. Wyman testified as fol-" lows:

"I have known Maurice Casey for about 10 years. During the last four or five years I have had business with him right along, so we became familiarly acquainted. I

have noticed that since the first of the summer he has acted peculiarly, different from what he used to. The most of the conversation I had with him was concerning his family troubles,—his wife and children leaving him and being away from him,—and thought his mother-in-law had a good deal to do with it, and would talk about nothing else in my company. He was talking about it all the time, and didn't talk about anything else. He used to be in my shop from one to half a dozen times a day when he wasn't working. He would sometimes come in and cross the shop two or three times with his head down, not noticing or speaking to any one. Sometimes we would speak to him, but he would not answer us. We have passed each other on the street, he not noticing or speaking to me, and we were good friends. Lots of times I spoke to him when passing him on the street, and he didn't answer. I have met him on Second street, going to and coming from my meals, and heard him talking to himself and making gestures. I remember one time passing him, I think, near the Beebe Block. I was going to my dinner. He was going downtown, with his head down, making motions with his hands as though he were speaking to some one. I met him face to face. Then he didn't speak to me, nor I to him. He didn't notice me, so I passed him right by. I didn't like to speak to him any more than I could help, because he would talk about nothing else but his troubles, and I didn't want to be bothered with him. I was acquainted with him in 1894, 1895, and 1896. I don't think he ever spoke of his family troubles during these years. Never saw him act that way before 1897. I noticed a radical change in his conduct. I saw respondent the next day after he was arrested. I thought he was a raving maniac that day. He was hollering and raving around the jail. Would throw himself on the floor and cry and holler. Then he would turn and walk away from the door of the jail, and laugh as he moved away. It sounded to me like a maniacal laugh. I talked with him that day. He answered me a part of the time. When I first went in he didn't know me until I spoke to him a couple of times. Then he reached his hand through the grates of the door and shook hands with me. I remember one time of telling him that he was going crazy, but I don't remember what he said in reply."

He was then asked to state whether he considered the respondent sane or insane. The court held he was not

competent to express an opinion upon that subject, and excluded the testimony.

A number of other witnesses testified to their acquaintance with the accused and his unusual conduct and actions, and an offer was made to show that in their opinion the accused was insane. The judge held the testimony was incompetent.

The right to express an opinion as to sanity or insanity, where it is in issue, is not confined to experts. Any person having sufficient knowledge to speak intelligently upon that subject is competent. He may not express an opinion simply because he was acquainted with the person, but in addition thereto he must show facts and circumstances which the court can say tend to show the insane condition. When that is done, then the witness may express his opinion, and it is for the jury to say how much weight should attach to it. In *Armstrong* v. *State*, 30 Fla. 170 (11 South. 618, 17 L. R. A. 484), the question was raised as to the competency of certain witnesses to express an opinion as to the insanity of the accused, and the court used the following language:

"These witnesses conversed with him on the subject of his delusion, observed his strange conduct, and gave it as their opinion that he was insane on that subject. They are not shown to be experts in such matters, but the weight of authority is clearly in favor of admitting such testimony on an issue of sanity *vel non*. No objection was made to it on the part of the State in the case. 11 Am. & Eng. Enc. Law, 161, and authorities in note 1 to heading, 'Opinions of Nonexpert Witnesses;' 1 Whart. Ev. § 451; *Connecticut Mut. Life Ins. Co.* v. *Lathrop*, 111 U. S. 612 (4 Sup. Ct. 533); *McClackey* v. *State*, 5 Tex. App. 320; *Webb* v. *State*, Id. 596; *People* v. *Sanford*, 43 Cal. 29; *People* v. *Wreden*, 59 Cal. 392; *State* v. *Klinger*, 46 Mo. 224; *Wood* v. *State*, 58 Miss. 741; *State* v. *Newlin*, 69 Ind. 108; *Sage* v. *State*, 91 Ind. 141; *Clark* v. *State*, 12 Ohio, 483 (40 Am. Dec. 481). It may be proper to state that such witnesses cannot express a general opinion as to sanity, nor can they give an opinion independent of the facts and circumstances within their own knowledge; but they can detail the facts known to

them which show insanity, and thereupon express an opinion as to the sanity of the person whose mental condition is being investigated.   Of course, the value of such testimony must depend largely upon the opportunities of the witnesses to correctly observe the appearances and conduct of the person whose mind is claimed to be unsound, as well as the character of such appearances and conduct.   The witnesses who testify as to the mental disorder of the accused had an opportunity to observe him closely, and some of them made special investigation as to his condition."

This opinion is in harmony with the decisions of our own court.   *Beaubien* v. *Cicotte*, 12 Mich. 459; *O'Connor* v. *Madison*, 98 Mich. 183 (57 N. W. 105); *People* v. *Borgetto*, 99 Mich. 336 (58 N. W. 328); *Prentis* v. *Bates*, 93 Mich. 234 (53 N. W. 153, 17 L. R. A. 494).   We think the proper foundation was laid to make these witnesses competent to express an opinion.

Upon the trial the people were allowed to swear a witness in rebuttal, without the name of the witness being indorsed upon the information, and without requiring any showing why it was not indorsed.   Section 11934, 3 Comp. Laws 1897, relating to the indorsement of names upon the information, has been repeatedly construed by this court. See the cases cited in the note to this section.   In *People* v. *Quick*, 58 Mich. 321 (25 N. W. 302), Justice CAMPBELL, speaking for the court, said:

"We have held on several occasions that the defendant has a right to know in advance of the trial what witnesses are to be produced against him, so far as then known, and to have any new witnesses indorsed on the information as soon as discovered.   The object of this is not merely to advise a respondent what witnesses will be produced on the main charge; it is to guard him against the production of persons who are unknown, and whose character he should have an opportunity to canvass.   It is as important to impeach a rebutting witness as any other."

In *People* v. *Howes*, 81 Mich. 396 (45 N. W. 961), Justice GRANT, for the court, said:

"The prosecuting attorney was present at the examination before the justice, and then knew of this witness.

The statute required him to indorse upon the information the names of the witnesses then known to him, and authorized him to indorse the names of other witnesses at such time before the trial as the court may, by rule or otherwise, prescribe. 2 How. Stat. § 9549. It needs no argument to show that the letter and spirit of this statute were violated in permitting the name of this witness to be indorsed after the trial had commenced. This right given by the law to the accused is a substantial one, which courts cannot ignore. The carelessness or neglect of the prosecuting attorney will not warrant the court in permitting names to be indorsed upon the trial when the witnesses were before known to him."

Should the testimony introduced upon the part of the respondent make it necessary to call witnesses in rebuttal whose names, and the materiality of whose testimony, until then were unknown to the prosecuting attorney, upon a showing of those facts it would be the duty of the judge to allow the names to be indorsed. Until this is done, the testimony of the witness may not be taken.

The other assignments of error do not call for discussion. For the reasons stated, the judgment of the court below is reversed, and a new trial ordered.

The other Justices concurred.