PEOPLE *v.* COLE.

SEPARATE OPINION.

T. M. KAVANAGH, J.

1. APPEAL AND ERROR — QUESTIONS REVIEWABLE — MISCARRIAGE OF
   JUSTICE.
   *An issue not specifically raised on appeal may properly be con-*
   *sidered by the Supreme Court in order to prevent a gross*
   *miscarriage of justice.*

2. WITNESSES—OPINIONS—INSANITY.
   *The right of a witness to express an opinion as to sanity, or*
   *insanity, where it is at issue, is not confined to experts.*

---

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 726.
[2, 4–8] 31 Am Jur 2d, Expert and Opinion Evidence §§ 88, 92–94.
[3, 19] 31 Am Jur 2d, Expert and Opinion Evidence § 88.
[9] 31 Am Jur 2d, Expert and Opinion Evidence § 93.
   Requisite foundation or predicate to permit nonexpert witness to
      give opinion, in a civil action, as to sanity, mental competency,
      or mental condition, 40 ALR2d 15.
   Competency of testimony of nonexperts on question of sanity or in-
      sanity in criminal cases. 72 ALR 579.
   Necessity of laying foundation for opinion of attesting witness as to
      mental condition of testator or testatrix. 93 ALR 1049.
[10] 31 Am Jur 2d, Expert and Opinion Evidence §§ 92, 93.
[11, 12] 31 Am Jur 2d, Expert and Opinion Evidence §§ 92–94.
[13] 21 Am Jur 2d, Criminal Law § 583 *et seq.*
[14–17] 21 Am Jur 2d, Criminal Law § 55 *et seq.*
[17] 21 Am Jur 2d, Criminal Law § 53.
[18] 40 Am Jur 2d, Homicide §.446.
[20] 21 Am Jur 2d, Criminal Law §§ 45, 53.

3. Same—Nonexpert—Opinion—Insanity—Circumstances.

  *Nonexpert witnesses are not permitted to express general opinions as to sanity or insanity or to give opinions independent of the facts and circumstances within their own knowledge.*

4. Criminal Law — Insanity — Circumstances — Opinion of Nonexpert.

  *Evidentiary rule that a nonexpert witness who testifies upon the issue of sanity or insanity must disclose the circumstances upon which his opinion is based applies to criminal as well as civil cases.*

5. Witnesses—Lay Witness—Opinion—Insanity.

  *A lay witness must establish that he was sufficiently acquainted with the individual whose sanity is in issue so as to testify to mental condition on a comparative basis and not merely to some manifested idiosyncrasy or eccentric behavior before being permitted to express an opinion on the matter.*

6. Criminal Law — Lay Witness — Opinion —Insanity — Conclusions.

  *The foundation to be laid in order to permit a lay witness to express an opinion on the issue of sanity of a defendant in a prosecution for crime must indicate that the conclusions of the witness bear directly upon the issue of sanity and are not merely conclusions of fact as to the defendant's conduct.*

7. Same — Nonexpert Testimony — Insanity — Admissibility — Discretion of Court.

  *Admission of nonexpert testimony on issue of sanity of defendant in a prosecution for crime requires the trial judge to consider the character and nature of the alleged mental condition and, especially in a criminal case, resolve all doubts in favor of defendant.*

8. Same — Nonexpert Witness — Opinion — Insanity — Observations — Time.

  *The facts and circumstances detailed by a nonexpert witness before he may give an opinion on the issue of sanity of one charged with crime must be shown to have come from an opportunity to observe the defendant closely, and there must be a proximity in point of time between the act involved and the facts supporting the lay person's opinion.*

9. SAME—ADMISSIBILITY—OPINION OF LAY WITNESSES—DISCRETION OF COURT.

> *An abuse of discretion by the trial court, in the admission of the opinion of a lay witness on the issue of sanity of a person charged with murder is cause for reversal by the Supreme Court.*

10. SAME — NONEXPERT YOUNG WITNESS — INSANITY — BASIS FOR OPINION — COMPETENCY.

> *Admission of testimony of a 16-year-old boy wherein he expressed an opinion that he did not see anything unusual about defendant, charged with murder, held, reversible error, where no foundation was laid to render such witness competent to give any opinion as to defendant's sanity.*

11. SAME—LAY WITNESSES—ADMISSIBILITY OF OPINION TESTIMONY—DURATION OF OBSERVATION.

> *Testimony of 4 lay witnesses who were strangers to defendant, charged with murder, that defendant appeared normal, rational, calm, cool, and collected, should have been held inadmissible where each of such witnesses had observed defendant for only brief periods of not to exceed half an hour and each failed to disclose a proper foundation to support his opinion of normalcy.*

OPINION OF THE COURT.
T. E. BRENNAN, C. J., and DETHMERS, KELLY, and T. M. KAVANAGH, JJ.

12. HOMICIDE—INSANITY—EVIDENCE—BURDEN OF PROOF OF SANITY—ADMISSION OF UNSUPPORTED OPINIONS OF LAY WITNESSES.

> Testimony of 5 lay witnesses presented by prosecution on charge of murder where defendant had interposed and supported defense of insanity *held,* incompetent and wholly inadequate to establish prosecution's burden of proof of defendant's sanity beyond a reasonable doubt and the admission of such opinions was reversible error.

SEPARATE OPINION.
T. M. KAVANAGH, J.

13. CRIMINAL LAW—PUNISHMENT—INSTRUCTIONS.

> *Generally the assessment of punishment is a question of law and exclusively within the province of the court; hence, instructions as to punishment are extraneous and should not be given to jury since it will hinder, rather than aid, the jury in determining the issue of guilt.*

14. SAME—ACQUITTAL BECAUSE OF INSANITY—POSTVERDICT STATUS.

*The postverdict status of one acquitted of crime on the ground of insanity is not punishment in the true sense or usage of that word.*

15. SAME—POSTVERDICT STATUS—COMMON KNOWLEDGE—INSANITY.

*It is common knowledge that a verdict of not guilty means that the accused goes free and that a verdict of guilty means that the accused is subject to such punishment as the court may impose, but a verdict of not guilty by reason of insanity has no such commonly understood meaning.*

16. SAME—NOT GUILTY BECAUSE OF INSANITY.

*A jury in a prosecution for crime has the right to know the meaning of a verdict of not guilty by reason of insanity as accurately as it knows by common knowledge the meaning of a verdict of guilty or not guilty.*

OPINION OF THE COURT.

KELLY, BLACK, T. M. KAVANAGH, and ADAMS, JJ.

17. SAME—INSANITY—INSTRUCTIONS AS TO POSTVERDICT STATUS.

A jury must be instructed that the verdict of not guilty by reason of insanity means that the accused will be confined in a hospital for the mentally ill until it is duly determined that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others, where the defense of insanity is present, the issue of insanity is made submissible by proofs, and request for such instruction is made either by the defendant or the jury.

SEPARATE OPINION.

KELLY, J.

See headnotes 12 and 17.

18. HOMICIDE—INSANITY—EVIDENCE OF SANITY.

*Evidence presented by prosecution on charge of murder in which defendant interposed and supported defense of insanity held, to have shown the people's failure to prove defendant was sane when he shot electric utility employee as latter was shutting off the service at defendant's home.*

SEPARATE OPINION
ADAMS, J.

See headnote 17.

19. WITNESSES—OPINION OF NONEXPERT WITNESS—MENTAL CONDITION—CIRCUMSTANCES.

*A nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person.*

SEPARATE OPINION.
T. E. BRENNAN, C. J., and DETHMERS, J.

See headnote 12.

20. CRIMINAL LAW—NOT GUILTY BECAUSE OF INSANITY—INSTRUCTIONS AS TO RESULT OF VERDICT.

*Instruction as to result of verdict of not guilty of crime charged by reason of insanity must not be given in a prosecution in which defense of insanity is interposed and supported.*

SEPARATE OPINION.
BLACK, J.

See headnote 17.

Appeal from Court of Appeals, Division 2, T. G. Kavanagh, P. J., and J. H. Gillis and McGregor, JJ., affirming Genesee, Parker (Donn D.), J. Submitted March 5, 1969. (Calendar No. 14, Docket No. 51,-902–1/2.) Decided December 2, 1969.

8 Mich App 250, reversed.

Johnnie L. Cole was convicted of murder in the second degree. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Reversed and remanded for new trial.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert F. Leonard,*

Prosecuting Attorney, and *Donald A. Kuebler*, Assistant Prosecuting Attorney, for the people.

*Milliken & Magee*, for defendant.

T. M. KAVANAGH, J. Charged with the crime of first-degree murder,[1] defendant, upon giving the required notice, interposed the defense of insanity. The jury, at the conclusion of the trial, found defendant guilty of second-degree murder,[2] and a sentence of 35 to 50 years was imposed.

On appeal, the Court of Appeals, in a split decision, affirmed the conviction. 8 Mich App 250. Judge THOMAS G. KAVANAGH dissented, for the reason that the jury should have been informed as to the disposition of the defendant if he were found not guilty by reason of insanity.[3]

Defendant is here on leave granted (380 Mich 757) and raises four questions:

1. Should the court have asked prospective jurors the proposed *voir dire* questions requested by defendant?

2. Was there sufficient evidence before the jury for it to find defendant guilty beyond a reasonable doubt?

3. Should the court have instructed the jury, as requested by the defendant, that if it found the shooting was the product of mental disease or mental defect of the defendant, the jury must return a verdict of not guilty by reason of insanity?

4. The fourth question is divided into three parts:
(A) Should the court have instructed the jury, as

---

[1] See CL 1948, § 750.316 (Stat Ann 1954 Rev § 28.548).—REPORTER.
[2] See CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549).—REPORTER.
[3] Justice *Thomas G. Kavanagh* has authorized the writer to state that, were he not disqualified from participating in this case, he would indorse and subscribe this opinion.

requested by the defendant, that a finding of "not guilty by reason of insanity" means that the accused would be confined in a State hospital for the criminal insane for the remainder of his natural life or until such time as the governor discharged him upon recommendation of the State hospital commission, based upon investigation by it and its determination that such discharge would not be harmful to other persons or their property, or until such time as the court discharged him through an investigation and a judicial determination of his sanity?

(B) Should the court have answered the following question submitted by the jury: "Will a verdict of not guilty by reason of insanity insure the defendant of immediate release without further treatment in an institution?"

(C) Should the court have allowed defendant's attorney, in his opening and closing arguments, to advise the jury as to the legal disposition of the defendant if a jury returned a verdict of "not guilty by reason of insanity?"

The facts necessary to an understanding of the questions involved in this case are:

Defendant left his place of employment and returned to his home at approximately 1:30 in the morning. Suffering generally from pains in his back, head, side, and foot, defendant attempted to relieve his general discomfort and pain by soaking in a tub of hot water until approximately 4:30 a.m., at which time he went to bed. He was awakened about 9 a.m., by his wife, who informed him that a man was cutting off their utilities. Defendant took a gun, which he had owned for approximately 11 years, and confronted the utility employee. Defendant asked him not to shut off the meter and requested a half hour to get the money. The utility employee told defendant that his orders were to cut off the lights and that he could

not give him any more time. Thereupon, defendant shot and killed him.

At the trial defendant raised the properly-noticed defense of "not guilty by reason of insanity." Defendant's counsel, making his opening statement to the jury, attempted to make reference to defendant's ultimate disposition if found not guilty by reason of insanity. The prosecution objected, and the court ruled that nothing could be told the jury along this line.

During the course of the trial, the evidence introduced by defendant disclosed that he had spent considerable time in a psychiatric ward in Walter Reed hospital in 1951–1952, his troubles apparently resulting from injuries received while in military service. After discharge from the army in 1952 for psychiatric reasons, he received a disability pension in amounts varying from 10% to 30%. At the time of the shooting he was receiving a 10% disability pension. He obtained a job at the Chevrolet plant in Flint in 1952 and worked steadily at his employment up to the time of the killing. He had never been disciplined at work and had no criminal record.

There was also considerable expert medical testimony introduced by defendant relating to the defense of insanity.

Dr. Steinhardt, a practicing physician specializing in psychiatry, had examined defendant at the Veterans Administration hospital in Dearborn, Michigan, on June 5, 1964, four days before the shooting for which defendant stood trial. He testified that although defendant was in moderate remission from his schizophrenic reaction, it was his professional opinion that defendant would under stress lose control and act irrationally. He did not feel that defendant was psychotic at the time of his last examination, but concluded in his examination report, and

also testified, that defendant still had residual elements of his illness.

Dr. Pollie, assistant professor of psychology at the Flint branch of the University of Michigan, administered psychological tests to defendant on October 17 and 18, 1964. The psychologist testified that in his opinion the defendant was suffering from undifferentiated schizophrenic reaction, that he .could not make accurate judgments in the face of stress, that his mind was preoccupied by his own fantasies many times, that he had excessive concern about things that would harm him, and that these emotional and mental difficulties were of long duration. When asked whether defendant could have been faking his mental illness, Dr. Pollie answered as follows:

"*Q.* Doctor, do you have any type of controls that you can use to tell whether or not an individual is faking in the answers?

"*A.* Well, there are tests of consistency, for example. The relationship between tests gives some idea as to whether the person is faking or not. If there is a consistent pattern from test to test, the indications would be that the individual is giving an accurate and reliable performance. If there is a marked difference from test to test, the individual is possibly faking.

"*Q.* And what was your opinion from the controls that you have in this case?

"*A.* * * * In terms of my experience I see no evidence here of faking. If he fakes these, he is one of the best fakers I have ever encountered. I couldn't do it myself, although I have given these tests many times."

Dr. Forrer, a doctor of medicine specializing in psychiatry, and chief of staff at Hurley hospital in Flint, examined the defendant on two occasions after the shooting and had at his disposal the Veterans Administration records from Walter Reed

hospital and the written results of the psychological tests administered by Dr. Pollie. It was Dr. Forrer's opinion that at the time of the shooting the defendant was suffering from a schizophrenic illness and was unable to determine right from wrong, that he did not have the power to resist the impulse to shoot the deceased, and that the shooting was the result of a mental disease of defendant.

The prosecution introduced no expert witness as to the mental condition of defendant. However, the people did present five lay witnesses who related their personal observations of defendant.

Leslie Hampton, a neighbor, testified he saw nothing unusual as defendant walked down his porch steps with the revolver and walked back after the shooting.

Deputy Lloyd Goudy, the first police officer at the scene, testified that he responded to a call and went to defendant's home, and, in response to a knock, "a colored gentleman" (defendant Cole) opened the door and

"I asked him what had happened, and he stated that he had told the man not to shut off the gas, and he was going to do it anyway, so he shot him. Then I asked him how many times he shot, and he said he shot 5 or 6 times. * * * I went on into the house and I asked him where the gun was, and he pointed to the back of the room. There was a pistol laying on the sink. * * * I took the pistol and I put the handcuffs on Mr. Cole, and we went outside. I didn't —I didn't want to leave Mr. Hanley, because I thought perhaps there was a chance that he might come to, or something. We walked by Mr. Hanley and Mr. Cole looked down at him and stated, 'Man, that guy sure liked his job.' * * * He seemed real calm to me, sir."

Deputy Sheriff Trier's questioning of defendant after he was transferred from Goudy's cruiser to Trier's car, follows:

"*Q.* Did you shoot that man?

"*A.* Yes.

"*Q.* Why did you shoot him?

"*A.* Because he was going to shut off my lights.

"*Q.* Do you mean just because he was going to shut off your lights you shot him?

"*A.* Yes.

"*Q.* How many times did you shoot, more than once, 2 or 3 times?

"*A.* I emptied the gun.

"*Q.* How many shots is in your gun?

"*A.* Six, I think.

"*Q.* Tell me in your own words what happened?

"*A.* Well, I was in bed, and my wife woke me up and said that a man from Consumers Power was here, and that he is going to cut the lights off. I put on my shirt and pants and got my gun and went outside. The man was at the meter with a screwdriver and was screwing on the meter. I asked him to stop, and let me go get some money. He said that we had already had 40 days to do that. I asked him to give me a half an hour to get the money. He said that he was ordered to cut the lights off, and that he could not give me any more time. I took the gun out and pointed it at him. He looked at me, and I started firing. I went into the house and put the gun on the sink. I told one of the kids to call the police. * * *

"*Q.* Did you mean to shoot this man?

"*A.* Yes, he was going to shut off my lights.

"*Q.* Were you going to shoot him when you came out of the house?

"*A.* No.

"*Q.* When did you decide to shoot him?

"*A.* When he would not stop screwing at the meter, and give me more time.

"*Q.* Had you ever seen this man before?

"*A.* No.

"*Q.* Did this man say anything out of line to you?

"*A.* No.

"*Q.* Did he offer to fight with you?

"*A.* No, he was very nice about it. He said that he was only doing his job.

"*Q.* Did you hate this man?

"*A.* No. The only thing I can say about him is that he must have really liked his job.

"*Q.* Why do you say that?

"*A.* Because he would not stop screwing.

"*Q.* Had you been drinking at all?

"*A.* No."

Deputy Sheriff Trier testified that at all times defendant was entirely cooperative and caused him no difficulty; that he appeared calm, collected, and cool until on the way to the Genesee county jail when "he started crying and just his tone of voice changed."

Deputy Raymond Dudley was with Deputy Trier when defendant was questioned. He testified that he saw nothing too unusual about the defendant, that he seemed very much concerned about the family of the man he shot, that defendant stated the shooting wouldn't have happened if the man would only have stopped screwing on the meter, and that as far as he (Dudley) could see, defendant appeared to be normal.

Roy Brown stated that after hearing about the shooting he called the ambulance and then went down to Cole's home, and "I asked him [Cole] what happened, and he said he begged the guy to give him 30 minutes * * * not to cut off his lights * * * he would have paid the bill, and that was all." Brown testified that Cole did not appear to be intoxicated and he noticed nothing unusual about his appearance or his communication.

We have at this point sufficient facts from the record to clearly frame an issue which, although

not specifically raised on appeal, will be considered
by the Court to prevent a gross miscarriage of jus-
tice.   See *Dation* v. *Ford Motor Company* (1946),
314 Mich 152 (19 NCCA NS 158).

We have before us the entire spectrum of tes-
timony as to sanity or insanity ranging from an
expert witness who was a treating psychiatrist to
the arresting officer who is, relatively, a complete
stranger.   From this wealth of testimony arises two
conflicting positions.   The defendant claims that the
introduction of testimony of the psychiatrists over-
came the presumption of sanity and that the prosecu-
tion failed, as required, to prove defendant's sanity
beyond a reasonable doubt.   The prosecution, on the
other hand, contends that the testimony elicited
from its five lay witnesses was sufficient to put the
question of sanity before the jury.

It is an almost universally accepted doctrine that
the right to express an opinion as to sanity, or in-
sanity, where it is at issue, is not confined to the
experts.   *People* v. *Casey* (1900), 124 Mich 279; 31
Am Jur 2d, Expert and Opinion Evidence, § 88.   The
evidentiary rules governing the competence of non-
expert witnesses to express opinions as to sanity or
insanity apply equally to criminal prosecutions as
well as to civil actions.   *Beaubien* v. *Cicotte* (1864),
12 Mich 459.

It is equally well established that nonexpert wit-
nesses are not permitted to express general opinions
as to sanity or insanity or to give opinions independ-
ent of the facts and circumstances within their own
knowledge.   Stated more affirmatively, this Court
in *Beaubien* v. *Cicotte, supra,* set out a general rule
(pp 501–503):

"In the United States, the authorities all require
the witness to state such facts as he can, in order
that the jury may be better enabled to determine the

value of his opinions—stress being, of course, laid upon his opportunities of judging. * * *

"The authorities in this country have passed directly upon points which in England have been settled by unbroken practice; and we find, therefore, that here the admissibility of nonprofessional testimony has been discussed very fully. The general doctrine is, that all witnesses speaking from observation must, as far as possible, state such facts as they can give as the basis of their opinion. * * * But, from the nature of things, no rule can be laid down declaring what amount of acquaintance, or what opportunities, are necessary to enable an observer to be a witness. There are cases of insanity open to the slightest scrutiny, while others defy the keenest search. But no testimony can be of any real value, unless it appears the witness had adequate means and opportunities for forming some conclusion."

Nearly 30 years subsequent to the *Beaubien* v. *Cicotte* decision the Court reiterated the general rule and analyzed the factors to be considered in a proper exercise of judicial discretion in passing upon the rule. In *O'Connor* v. *Madison* (1893), 98 Mich 183, we stated (pp 188, 189):

"This opinion, if read in the light of the writer's opinion in the case of *White* v. *Bailey* (1862), 10 Mich 161, leaves no room for doubting that *it is the settled law of Michigan that an opinion that a testator was incompetent can only be given when the witness has testified to circumstances upon which it is predicated, and which to some extent justify it.* White v. Bailey (1862) 10 Mich 161; Beaubien v. Cicotte (1864), 12 Mich 459; Rice v. Rice (1883), 50 Mich 448; Kempsey v. McGinniss (1870), 21 Mich 123; Prentis v. Bates (1891), 88 Mich 567, (1892), 93 Mich 234 (17 LRA 494). The extent to which such proof must go cannot be limited by an inflexible rule. *It must depend upon the familiarity of the witness*

*with the testator, the character of the disqualifica-
tion, the nature and number of extraordinary cir-
cumstances detailed, and proximity to the act in-
volved in point of time."* (Emphasis supplied.)

Both *O'Connor* v. *Madison* and *Beaubien* v. *Cicotte*
were adopted as the rule in criminal prosecutions.
In *People* v. *Borgetto* (1894), 99 Mich 336, this Court
stated (pp 340, 341):

"We think counsel is right in the assertion that a
witness must state his opportunities for observation
in both cases, and in neither can he state too many
of the circumstances which have come under his ob-
servation that throw light upon the subject, and lead
him to a conclusion. No witness should be allowed
to state his opinion, one way or another, until there
is some evidence tending to show that he has some
knowledge."

Although this latter case pointed out a difference
in the nature of the testimony requisite as a basis for
opinions of sanity as distinguished from insanity,
it did not use any such distinction for departing from
the single general rule and concluded by stating (p
342):

"What is required to show a sufficient opportunity
depends upon circumstances which may properly
move the judicial discretion, the testimony being
more or less valuable as the circumstances are con-
vincing."

The first and only departure from consistent ap-
plication of the rule appears to have occurred in
*People* v. *Hannum* (1961), 362 Mich 660. In this
case four members of an equally divided Court felt
that the question was not one of admissibility but,
rather, one of weight to be given the testimony by
the jury.

While we have no quarrel with the result reached
in that decision, we must redefine our policy

to prevent the abdication of judicial duties to the jury. As manifested by this case and other cases pending before this Court (see, *e.g., People* v. *Herrera,* Calendar No 4, October Term 1969[4]) dismissing the problem as one of "weight to be given the testimony" serves most inadequately as a guide to our trial bench. We set these guidelines not to mandate how a trial judge shall use his discretion, but rather to point out some of the factors to be considered in his exercise of discretion.

Before a lay witness is permitted to state an opinion regarding the sanity or insanity or mental competency or incompetency of a person whose mental condition is at issue, the witness must have had ample opportunity to observe the speech, manner, habits, or conduct of the person. To render himself competent under this rule, *the witness must establish he was sufficiently acquainted with the defendant or testator so as to testify to mental condition on a comparative basis and not merely to some manifested idiosyncrasy or eccentric behavior.* The foundation to be laid in such case must indicate that the conclusions of the witness bear directly upon the issue of sanity and not merely conclusions of fact as to defendant's conduct. (See *People* v. *Zabijak* [1938], 285 Mich 164.)

The trial judge must also consider the character and nature of the alleged mental condition. In the area of criminal law we must be ever mindful of the fact that "there are cases of insanity open to the slightest scrutiny, while others defy the keenest search." *Beaubien* v. *Cicotte, supra,* p 503. Bearing this in mind, we urge that before admitting nonexpert testimony on a matter as vital as the sanity of a defendant being tried for a capital offense, the

---

[4] This case was decided January 12, 1970. See 383 Mich 49.—RE-PORTER.

trial judge's discretion should be exercised by resolving all doubts in favor of defendant. *People* v. *Hannum, supra,* pp 674, 675 (SOURIS, J., concurring).

It must further appear that the witness took advantage of the opportunities to observe closely the person whose mental condition is at issue. The nature and number of extraordinary circumstances detailed must precede the giving of any opinion and the facts and circumstances so detailed must be such as tend to support the witness' conclusion. *In re Wallace's Estate* (1945), 313 Mich 37.

Finally, there must be a proximity in point of time between the act involved and the facts and circumstances offered as a basis to render and support the nonexpert's opinion. This is especially true where the defense is predicated upon the theory of irresistible impulse, for the aberrant, and otherwise criminal, behavior may cease once the triggering provocation is eliminated.

We take great pains to point out and emphasize that the careful consideration of the factors detailed above and the ultimate decision reached by the trial judge goes to the admissibility of the lay witness' opinion and conclusion. This is and always has been the law in this State in both civil and criminal matters.

In formulating the correct rule this Court in *Prentis* v. *Bates* (1892), 93 Mich 234 (17 LRA 494), stated at p 241:

"It is contended on behalf of the contestants that the jury are to be made the judges in all cases of whether the acquaintance of the witnesses with the party whose sanity is in question was such as to entitle their opinion to weight. In any case where they have shown sufficient acquaintance with the party as to render their opinion of any value whatever, this is undoubtedly true, and it can be said on

behalf of such a rule as is contended for that it is one more easy of application to particular cases than that which we believe to be the more *correct rule;* which is that in any given case *the trial judge should, as a preliminary question, determine whether there is any basis shown by the testimony of the witness for an opinion."* (Emphasis supplied.)

In *O'Connor* v. *Madison, supra,* this Court, after specifying the factors to be considered, stated (p 189):

"Taken as a whole, they should move the *judicial discretion of the trial judge,* by apprising him that the witness may fairly doubt the competency of the person upon reasonable grounds." (Emphasis supplied.)

This rule was recognized and specifically adopted in the area of criminal law. In *People* v. *Borgetto, supra,* the Court stated at p 342:

"What is required to show a sufficient opportunity depends upon circumstances which may properly move the *judicial discretion,* the testimony being more or less valuable as the circumstances are convincing." (Emphasis supplied.)

We note, also, the unanimity of foreign authorities to the same effect. See 31 Am Jur 2d, Expert and Opinion Evidence, § 93; 93 ALR 1049; 40 ALR2d 102, 105, § 49.

Where an abuse of the trial court's discretion as to the admission or exclusion of testimony is palpably manifested in the record, this Court must not and will not hesitate to reverse. *In re Lembrich's Estate (Smith* v. *McCarbery)* (1928), 243 Mich 39.

We now examine the people's proffered nonexpert testimony in the light of the above rule and factors to determine its admissibility.

Leslie Hampton, a 16-year-old neighbor of defendant, was examined by the prosecutor and responded as follows:

"*Q.* Aside from the fact he was carrying a pistol, did you notice anything unusual about him at that time?

"*A.* No. All I seen was he had a pistol.    *    *    *

"*Q.* Now, at the time Mr. Cole was shooting the gun, aside from the fact that he was shooting a gun, did you see anything unusual about him?

"*A.* No, sir."

Without going into the objectionable aspect of soliciting basically immature judgment as to sanity or insanity from a 16-year-old boy, we note that absolutely no foundation was laid to render this witness competent to give any opinion. No testimony was given which relates to the length, or even the fact, of acquaintanceship between the witness and defendant; no testimony establishes the nature and number of circumstances, other than this brief observation of the homicide, upon which he could predicate an opinion or judgment of the normalcy or abnormalcy of defendant. In spite of this, the prosecutor was permitted to elicit the opinion from a 16-year-old boy that he did not "see anything unusual about him [defendant]." We have previously held this type of testimony to be inadmissible. See *People* v. *Zabijak, supra.* As tested under the factors recited above, this testimony was incompetent and inadmissible and its admission constitutes reversible error.

Deputy Goudy, who had been with the sheriff's department for less than two years, testified that he arrived on the scene at 9:36 a.m. and left at 9:52 a.m. In this brief 16 minutes the witness could recall speaking to the defendant only one time. Yet he was permitted to testify on direct examination that "He seemed real calm to me, sir," and again on cross-

examination that "he appeared to be completely rational." This testimony, likewise, was insufficient to permit the rendering of an opinion as to defendant's sanity. Neither the time nor adequate opportunity necessary to predicate an opinion by the witness is disclosed by this record.

Detective Trier testified that he arrived on the scene at 9:44 a.m. and questioned the defendant only as to his vital statistics and the facts of the homicide. The only other time he spoke to defendant was on the way to the Genesee county jail at approximately 10:13 a.m. the same day. Even though Detective Trier had observed defendant for only, at most, approximately 1/2 hour, he was allowed to imply upon cross-examination that defendant appeared "calm, cool, and collected. * * * Up until [they] were on the way to the Genesee county jail." Even as to the latter fact, defendant's emotional breakdown, the testimony given at trial varies from Detective Trier's testimony given at the preliminary examination. Again, this testimony fails to qualify the witness as competent to opine as to defendant's sanity because the witness did not have "ample opportunity to observe" defendant and any opinion resting upon such improper foundation should have been excluded.

Detective Dudley, the officer in charge of this case, arrived with Detective Trier and conducted an investigation of the neighbors and the scene while Detective Trier interrogated the defendant. Although Detective Dudley was present when Trier questioned defendant en route to the county jail and possibly saw the defendant after his arraignment, he never claims to have spoken to defendant and never recites any details as to the length of time or the surrounding circumstances or the particularity of his observations of defendant's appearance and conduct.

Yet, upon direct examination, he was permitted to state that there was "nothing too much unusual about him" and that he appeared to be normal. This opinion, likewise, is incompetent and inadmissible.

The prosecution's last witness, Roy Brown, admitted that he was not acquainted with defendant, stated that he spoke to defendant for about 15 minutes at the scene, and flatly asserted that he did not have the occasion to observe defendant personally as to his appearance and attitude. Yet, the trial judge permitted direct examination which, inferentially at least, went to the question of defendant's sanity, *e.g.*, that defendant was not sweating profusely, that the pupils of his eyes were not enlarged, and that defendant's conversation was not unusual. This type of testimony was clearly inadmissible and constitutes reversible error. *People* v. *Zabijak, supra.*

Thus, we have the sum total of the people's proofs whereby they attempt to establish defendant's sanity beyond a reasonable doubt. We hold that the above testimony was wholly inadequate to render any of the opinions of the lay witnesses as being competent under the law above stated. The admission of these opinions was a manifest and palpable abuse of discretion and constitutes reversible error.

Concluding that reversible error exists, we must now consider a second issue raised in this appeal which will become relevant upon remand to the trial court. The issue is whether a jury should be instructed, upon their specific request or upon motion by defense counsel, as to the consequences of returning a verdict of not guilty by reason of insanity. The import of this issue and its effect upon the deliberations of a jury is clearly reflected by this record.

In the case at bar, defense counsel had attempted repeatedly, by argument, by oral motion, and by requested instructions, to inform the jury that a "finding of not guilty by reason of insanity means * * * that defendant would be confined in a State hospital for the criminally insane for the remainder of his natural life, or until such time as the governor discharged him upon recommendation of the State hospital commission." The trial court consistently prohibited any comment to the jury relating to commitment and refused to give defense counsel's requested instruction.

After the jury retired and after deliberating for over an hour, they returned to the courtroom and the following proceeding occurred:

"*The Court:* The court officer advises me you have a question.
"*Juror Davis:* Yes. I would like to submit it.
"*The Court:* Do you have it written out?
"*Juror Davis:* Yes.
"*The Court:* Fine. I am sorry, I cannot answer this question. [Will a verdict of not guilty by reason of insanity insure the defendant of immediate release without further treatment in an institution?] The issue before you 12 people is guilty only under the law that I have—as I have given it to you. You are not to take into consideration what the effect of that verdict will be.
"I am sorry, I cannot give it to you under the law."

The jury was escorted back to the jury room and, after deliberating for another hour, reported to the judge that they could not agree. At this juncture, the trial judge indicated his intention to give "the Allen charge," and inquired of counsel as to any objections. Defense counsel again requested the judge to inform the jury as to the commitment statute, but this motion was again denied. The jury

re-entered the courtroom and the following conversation occurred:

"*The Court:* Mr. Foreman, the court officer advises the court you have something you would like to say.

"*Juror Davis:* Yes. The jury is quite unable to agree, and we would like, if possible, to have the various degrees of guilty or not guilty re-read to them.

"*The Court:* Very well, just be seated."

The jury again retired to the jury room, but they were brought back for a clarification of the instructions given to them in response to their last question. Again, they retired to the jury room, deliberated, ate dinner, and further deliberated until 10:15 that evening. At that time the following transpired:

"*The Court:* The record may show the foreman advised the court officer that an agreement seems impossible.

"Is that correct, sir?

"*Juror Davis:* That seems to be the case at this time.

"*The Court:* Very well. The court is going to give you an additional charge on your duty to agree."

After the additional charge, the jury returned to the jury room and remained until 11:38 p.m., at which time they were excused until 9:30 the next morning. The next morning, after deliberating for over a half hour, the jury reported that they had agreed upon a verdict.

There appears to be very little precedent throughout the United States on the question as to whether a jury should be instructed as to the consequences of returning a verdict of not guilty by reason of insanity. It is a matter of first impression in Michigan.

As a general rule, the assessment of punishment is a question of law and exclusively within the province of the court. Therefore, instructions as to punishment are extraneous to the basic duty of the jury and should not be given, since it will hinder rather than aid the jury in determining the issue of guilt.[5]

However, we recognize as an inherent problem, in extending this general rule to the facts of the instant case, that the postverdict status of one acquitted on the ground of insanity is not "punishment" in the true sense or usage of that word.[6]

The weight of authority in the United States takes the position that the rule that the jury is not concerned with punishment is equally applicable to the procedure to be followed respecting an accused acquitted on the grounds of insanity.[7] In *State* v. *Garrett* (Mo, 1965), 391 SW2d 235, the court stated at p 242:

"Such an instruction has no legitimate bearing on any fact issue which the jury must decide; it is entirely clear that it might, if given, tend to influence the jury to find the existence of mental irresponsibil-

---

[5] See, *e.g.*, 33 FRD 523, Manual on Jury Instructions in Federal Criminal Cases, § 7.05, p 608; see, also, Mathes & Devitt, Federal Jury Practice and Instructions (1965), § 15.07.

[6] CL 1948, § 766.15c (Stat Ann 1954 Rev § 28.933[3]), in force at the time of the trial of this case read:

"Sec. 15c. Any person, who is tried for the crime of murder and is acquitted by the court or jury by reason of insanity, shall forthwith be committed by order of said court to a state hospital for the criminally insane for the remainder of his natural life. The governor may, however, discharge such person upon recommendation of the commission [state hospital commission], based upon an investigation by it and its determination that such discharge will not be harmful to other persons or their property."

CL 1948, § 766.15c was repealed by PA 1966, No 266. For present relevant statutory provisions, see PA 1927, No 175, ch 7, §§ 27a, 27b, as added by PA 1966, No 266 (MCLA §§ 767.27a, 767.27b, Stat Ann 1969 Cum Supp §§ 28.966[11], 28.966[12]). The present statute provides for "*treatment* in an appropriate state hospital" and for release by the center for forensic psychiatry.

[7] See 11 ALR3d 737.

ity by deviating from the strict confines of the evidence on the subject of mental disorder. The weakness of the whole contention is rather clearly shown in the opinion which really started the controversy (*Taylor* v. *United States* [1955], 95 US App DC 373 [222 F2d 398]) where the court said that, although such an instruction would have no '*theoretical* bearing' on the case, it might have a very '*practical* bearing'; and, also, in Missouri Bar Journal, December 1963, *loc cit* 733, where the authors state (quoting) that such instruction 'may be an enormous influence on the jury's deliberations.' * * * No doubt it would be, but at the same time it would divert the jury from the real merits of the insanity issue by the introduction of this extraneous consideration, which actually is nothing less than an invitation for the jury to find the defendant mentally irresponsible *because* he would then be confined anyway."

See, also, *Pope (Duane E.)* v. *United States* (CA 8, 1967), 372 F2d 710; *Pope (Lawrence C.)* v. *United States* (CA 5, 1962), 298 F2d 507; *State* v. *Moeller* (1967), 50 Hawaii 110 (433 P2d 136); *State* v. *Park* (1963), 159 Maine 328 (193 A2d 1).

The contrary position has been taken principally by the Federal courts in the District of Columbia. In *Lyles* v. *United States* (1957), 103 US App DC 22 (254 F2d 725), the court stated at page 25:

"This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. But we think that doctrine does not apply in the problem before us. The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a ver-

dict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955 [69 Stat 710, DC Code § 24–301 (1951) (Supp 5)]. It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts."

See, also, *Taylor* v. *United States* (1955), 95 US App DC 373 (222 F2d 398); *Catlin* v. *United States* (1957), 102 US App DC 127 (251 F2d 368); *Kuk* v. *Nevada* (1964), 80 Nev 291 (392 P2d 630).

This appeal makes it mandatory that this Court choose between: (1) the possible miscarriage of justice by imprisoning a defendant who should be hospitalized, due to refusal to so advise the jury; and (2) the possible "invitation to the jury" to forget their oath to render a true verdict according to the evidence by advising them of the consequence of a verdict of not guilty by reason of insanity.

We conclude that the reasons given in support of the first proposition far outweigh the fear of jury integrity expressed in the second proposition.

We feel that *Lyles* v. *United States, supra,* is the better reasoned authority and hold that in all criminal trials or retrials taking place after the date of the filing of this opinion, where the defense of insanity is present and that issue is made submissible

by the proofs, the defendant, upon his own timely request, or upon request of the jury, shall be entitled to an instruction in accord with the rule of *Lyles*.

Our holding above on both discussed issues makes it unnecessary to pass upon the remaining issues presented in this appeal.

We reverse and remand for new trial in conformity with this opinion.

BLACK, J., concurred in the result.

KELLY, J. (*concurring in reversal and remand for new trial*). The question presented on this appeal is: "Was there sufficient evidence before the jury for it to find the defendant guilty beyond a reasonable doubt?"

Justice T. M. KAVANAGH raises, for the first time, the question as to the admissibility of the lay witnesses' testimony.

The people did not claim their State's witnesses had expressed opinion in regard to defendant's sanity, but relied upon what my Brother describes as "their personal observations of defendant."

Justice T. M. KAVANAGH's able summation proves beyond doubt the people's failure to prove defendant sane when he committed what was aptly described by the Court of Appeals* as a "senseless homicide."

My agreement with Justice T. M. KAVANAGH on issue number one is based on the conclusion that there was not sufficient evidence and not on his conclusion that reversible error was committed by the introduction of improper opinion evidence—an issue not specifically raised on appeal.

I agree with Justice T. M. KAVANAGH's opinion on issue number two *in re* instruction as to consequence

---

* *People* v. *Cole* (1967), 8 Mich App 250. Appeal granted 380 Mich 757.

of returning a verdict of not guilty by reason of insanity.

Adams, J. (*concurring*). I concur with Justice T. M. Kavanagh in the holding that the admission of the testimony of the lay witnesses as to the question of the insanity of the defendant was error. Instead of restating the rule in such cases, I would reaffirm and apply the rule as stated in *People* v. *Zabijak* (1938), 285 Mich 164, 185:

"A nonexpert witness who has had ample means to observe and form conclusions as to the mental condition of a person and who testifies to pertinent facts on which his conclusions are based may state his conclusions as to the insanity of a person."

I agree with that portion of his opinion which deals with the second issue on appeal and which holds that "in all criminal trials or retrials taking place after the date of the filing of this opinion, where the defense of insanity is present and that issue is made submissible by the proofs, the defendant, upon his own timely request, or upon request of the jury, shall be entitled to an instruction in accord with the rule of *Lyles.*"*

Dethmers, J. (*concurring*). I concur with Mr. Justice Thomas M. Kavanagh that in this matter we should reverse and remand for new trial for the first reason stated in his opinion, namely that the "sum total of the people's proofs whereby they attempt to establish defendant's sanity beyond a reasonable doubt * * * was wholly inadequate to render any opinions of the lay witnesses as being competent under the law" as in his opinion set forth and stated. I disagree with the second reason stated

---

* *Lyles* v. *United States* (1957), 103 US App DC 22 (254 F2d 725).—Reporter.

in that opinion. I am unwilling to follow in this case *Lyles* v. *United States* (1957), 103 US App DC 22 (254 F2d 725). For my position in this respect I find adequate citation of authority and reasoning in Mr. Justice T. M. KAVANAGH's opinion and regret that he did not choose to follow it.

T. E. BRENNAN, C. J., concurred with DETHMERS, J.

BLACK, J. (*concurring in result*). Relying upon the rule of *Lyles* v. *United States* (1957), 103 US App DC 22 (254 F2d 725), as he does, I concur in the result reached by Justice T. M. KAVANAGH.

T. G. KAVANAGH, J., did not sit.