## PEOPLE v BENNETT

1. CRIMINAL LAW—EVIDENCE—CHAIN OF CUSTODY—WEIGHT.

A chain of custody was established where items of clothing were taken from a defendant by a police officer and placed on the workbench of a civilian examiner at the state police crime laboratory even though the officer did not mark the items and an overnight period elapsed before the clothing was examined, and there was some evidence presented to establish the proper foundation for the admission of this evidence; defendant's objections are properly directed to the weight to be afforded such evidence rather than to its admissibility.

2. TRIAL—FAIR TRIAL—PREJUDICE—APPEARANCES.

A trial must be free not only from prejudice, but from the appearance thereof.

3. CRIMINAL LAW—TRIAL—FAIR TRIAL—JURY—CONTACT WITH JURY.

A defendant was not denied a fair and impartial trial despite the fact that two women and a painter had contact with the jurors in the jury room where the jury was not deliberating when any of the incidents occurred, and where the jurors when questioned stated that no discussion about the case occurred between themselves and the visitors, the facts involved in the case were not cloaked with any "mischievous tendency", and the defendant was in fact afforded the appearance of a fair trial.

Appeal from Wayne, George E. Bowles, J. Submitted Division 1 March 11, 1974, at Lansing. (Docket No. 16148.) Decided April 30, 1974. Leave to appeal denied, 392 Mich —.

REFERENCES FOR POINTS IN HEADNOTES

[1] 21 Am Jur 2d, Criminal Law § 226.

[2, 3] 53 Am Jur, Trial § 35.

21 Am Jur 2d, Criminal Law §§ 221, 222, 234–240. Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases, 10 L Ed 2d 1243.

David L. Bennett was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Leonard Meyers,* Assistant Prosecuting Attorney, for the people.

*Daniel A. Burress, P. C.,* for defendant.

Before: HOLBROOK, P. J., and ALLEN and VAN VALKENBURG,* JJ.

ALLEN, J. October 20, 1972, defendant, age 17, was found guilty by a jury of murder in the first degree. He was sentenced to mandatory life imprisonment and appeals.

On the afternoon of May 9, 1972, the Wayne County Sheriff's Department was called to the residence of Michael Berry in Plymouth Township where they observed the body of Vivian Berry lying on the garage floor clad only in an open blouse and one socklet. The body had been stabbed repeatedly. The other socklet was found in the living room and an empty wallet and a pair of women's shoes in the dining room. The telephone book in the home was found opened to automobile repairs.

Earlier the same day the sheriff's office had received a telephone call from a citizen who lived four miles from the Berry residence, reporting that a boy about 17–18 years old had stopped his car in the caller's driveway and had asked to come in to phone a car dealer because he was having car trouble. Being suspicious, the citizen refused the

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

request but wrote down the license number. The sheriff's office in turn relayed the information to detectives investigating the crime at the Berry residence. The car was found to be registered in the name of Bennett who lived within three-quarters of a mile of the citizen making the telephone call. The Bennetts informed investigating officers they had loaned the car to their nephew, the defendant, who returned the car that afternoon. The officers found defendant attending a night typing class at Plymouth Central Junior High School. Noticing what appeared to be blood on the buckle of one of his shoes, defendant was placed under arrest and taken across the street to the Michigan crime laboratory where his clothing was seized, fingerprints taken, and fingernails clipped and scraped. Blood matching the blood of the deceased was found on the clothing, and the prints matched those found in the Berry garage.

At the conclusion of the people's proofs, counsel for defendant raised the defense of insanity and offered expert testimony of two psychiatrists. In rebuttal, the people called on a psychiatrist and a clinical psychologist. Testimony of all expert witnesses contained inculpatory statements made by defendant during clinical examination but the trial court's instructions advised the jury to exclude from the determination of guilt any testimony pertaining to commission.

It is argued that a number of items taken from defendant while he was at the state police crime laboratory were not properly traced to the defendant and should have been excluded. At trial, defense counsel said "I do object to the admission of those items in evidence until such time as proper tracing has been made". James D. Hauncher, a civilian employee at the Michigan State Police

scientific laboratory, was questioned by both the prosecutor and defense counsel regarding the chain of possession of the items at issue. At the conclusion of said questioning, prosecutor and defense counsel approached the bench, the trial court and counsel "had a side bar discussion off the record", and the trial court, pursuant to the prosecutor's motion, received the exhibits at issue. No objection by defense counsel was made at that time, but a motion to suppress was made at the conclusion of the people's case.

We hold that error was not committed when the trial court admitted the exhibits at issue. People's exhibits no. 38, a right boot; no. 39, a left boot; no. 40, a T-shirt; no. 41, a gold shirt; no. 44, a belt and trousers; and no. 46, a pair of jockey undershorts, each with the initials "J. D. H." thereon, were shown to have been connected with the crime and with defendant. The items were taken from defendant the evening of May 9 at the State Police Crime Laboratory by Sergeant Nasser who testified he placed them on Hauncher's workbench for laboratory examination the next morning. Hauncher testified he found the clothing when he arrived for work shortly after 8 a.m., at which time he placed his initials "J. D. H." on each item. He further testified the witness Nasser was present and informed him the clothing had been placed on the workbench the night before.

A chain of custody was established, and a proper foundation was laid for the admission of the above exhibits. *People v Stanley Mitchell,* 37 Mich App 351, 356–357; 194 NW2d 514 (1971), *lv to app den,* 387 Mich 751 (1972). See also *People v Beamon,* 50 Mich App 395, 398–399; 213 NW2d 314 (1973). Even though Nasser did not mark the items and an overnight period elapsed before the clothing

was examined, there was "some evidence" presented to establish the proper foundation for the admission of this evidence, and defendant's objections are properly directed to the weight to be afforded such evidence rather than to its admissibility. *People v Burrell,* 21 Mich App 451, 456–457; 175 NW2d 513 (1970), *lv to app den,* 383 Mich 807 (1970).

During the course of trial, the prosecutor told the trial court that two women spectators had gone into the jury room to use the ladies' room. Both of the women and the sheriff's deputy who supposedly gave them permission to enter the room were promptly brought before the trial court. One of the women had been in the jury room previously while the jury was in the courtroom. However, the event at issue transpired when some members of the jury were in the jury room but not deliberating. Both of the women stated that they did not talk to any of the jurors. At the conclusion of the trial court's questioning, defense counsel moved for a mistrial. Further questioning of the women took place and the trial court took defense counsel's motion under advisement.

The trial court then conducted a voir dire of the jury. The jurors "responded negatively" when faced with the court's inquiry as to whether any of the words exchanged related to the case at hand. Juror number 3 said that a painter had also been in the jury room, but that she did not discuss the case with him. Another juror said that he had seen a painter in the room, although he did not see the two ladies. Other jurors were questioned, and all of them said that no discussion about the case occurred between themselves and the two women. The trial court then spent approximately 30 more pages of the trial transcript questioning

each individual juror regarding the event at issue. None of the jurors felt that the appearance of the two women in the jury room would affect them in any way. Any conversation with the painter concerned only the painting he was doing in the jury room. The jurors said that they had complained to him about the fumes, and that they had never talked to him about the case. The painter was also questioned and stated that he did not discuss the case with any of the jury members.

One of the women testified that she was a former employee of the Wayne County Friend of the Court and had retired some two to three months before the beginning of the instant trial. The other woman was a friend of hers interested in visiting a court. Each woman knew the victim's husband.

Defense counsel stated that while the incident had caused him "a little distress", he then stated he was "satisfied that it was completely innocent". Both women said that no one had asked them to go into the room, in response to counsel's question. At the conclusion of said questioning, the trial court felt that this was a "completely innocent incident", felt that there was not any "mischief by the remotest guess", and denied defense counsel's motion for a mistrial. The trial court then directed a sheriff's deputy to insure that such an incident did not reoccur. Counsel renewed his motion for a mistrial, and the same was denied.

Relying primarily upon former Justice BLACK's opinion in *Zaitzeff v Raschke,* 387 Mich 577, 579; 198 NW2d 309 (1972), defendant has argued that the trial court committed reversible error when it failed to grant the above motion for mistrial. It is alleged that the court should conclude that defendant was not afforded the "appearance of a fair trial".

It is, of course, true that "a trial must be free not only from prejudice, but from the appearance thereof". *People v Percy Harris,* 43 Mich App 746, 751; 204 NW2d 734 (1972). Justice CAMPBELL once said "If a single juror is improperly influenced, the verdict is as unfair as if all were". *Churchill v Alpena Circuit Judge,* 56 Mich 536, 539; 23 NW 211 (1885). *Churchill* involves a situation in which, in the course of their deliberations, the jury went to a nearby hotel, made conversation with some people there, made known their current position as far as the verdict was concerned, and one of the jury's members inquired of the court stenographer about the public's sentiment regarding the case. 56 Mich 536, 537–538. Justice CAMPBELL said:

"The departure from the proper course of duty was not technical, but real and substantial, and involved several different kinds of acts of directly mischievous tendency, and whether the jury actually yielded to their influences against relators or not, there can be no presumption or ascertainment in any satisfactory legal way that this was not done." 56 Mich 536, 540–541.

In *Zaitzeff, supra,* Justice BLACK, joined by four other members of the Court, said that the practice of allowing anyone to enter the jury room while the jurors were there was "indefensible", and said that this practice had been encouraged:

"occasionally by 'no prejudice shown' conclusions of a group of Justices who cannot hope to know what was said, or done, or gestured, or hinted, in the sanctity of the jury room." 387 Mich 577, 579.

In the instant case, the trial court questioned each juror as to the event at issue. The painter was also questioned. The trial court then concluded that the event was an innocent incident devoid of mischief. The jury was not deliberating when any of the

incidents occurred. We find that the facts involved in the instant case were not cloaked with any "mischievous tendency", and that defendant was in fact afforded the appearance of a fair trial. Since defendant was not denied a fair and impartial trial, the trial court did not commit reversible error by denying the motion for a mistrial. *People v Foster,* 51 Mich App 213, 217; 214 NW2d 723 (1973).

During the course of its deliberations, the jury sent a note to the trial court, asking:

"Irrespective of the degree we find, will mental health be made available to the defendant?"

After counsel and the court discussed the meaning of the jury's request and what the appropriate response would be thereto pursuant to *People v Cole,* 382 Mich 695; 172 NW2d 354 (1969), the jury was brought into court and the trial judge asked the foreman to clarify the jury's request. He said that the jury wanted to know if psychiatric help would be available to defendant even if the jury had found in favor of the people in the first degree, second degree, or manslaughter. The foreman stated that the jury wanted to know whether or not mental health facilities would be made available to defendant even if they found him "legally sane". The jury was then returned to the jury room and began its deliberations. Before the trial court was able to promptly answer the jury's request, the jury returned with a verdict of guilty on the charge of first-degree murder. In response to the trial court clerk's question as to what the jury verdict was on the issue of legal insanity, the foreman said "The question of legal insanity did not enter into our finding at all".

Defendant argues that the jury's question consti-

tuted a request for an instruction by the jury as to defendant's disposition upon the jury's finding of not guilty by reason of insanity. Counsel argues that such an instruction should have been given immediately pursuant to *People v Cole, supra.* An examination of the facts involved clearly shows that the jury was not requesting a *Cole* instruction. Such an instruction had been given previously, and it is clear that the jury did not desire to have it repeated. Defendant's argument on this point is without merit.

Relying upon *Wardius v Oregon,* 412 US 470; 93 S Ct 2208; 37 L Ed 2d 82 (1973), defendant has argued that the lack of a provision for reciprocal discovery of the people's witnesses in the notice of insanity defense statute, MCLA 768.20; MSA 28.1043, renders that statute unconstitutional. Defendant's argument is not properly before our Court. Counsel failed to make such an argument before the trial court, and was not in fact precluded from presenting evidence on the question of defendant's sanity. No request for reciprocal discovery having been made in the court below, and no objections having been made to the proceedings below on this question, our Court finds that defendant has not preserved this issue for appellate review. Also, "[t]he record herein does not demonstrate [a clear and manifest] injustice". *People v Ray Clifton Smith,* 20 Mich App 243, 245; 174 NW2d 22 (1969).[1]

---

[1] The Supreme Court of Colorado has applied *Wardius* to its notice of alibi statute and found it to be a violation of due process. *Raymond v District Court,* 14 Crim L Rptr 2291 (Jan 9, 1974). However, the Supreme Court of Colorado withdrew that opinion on rehearing, finding that Mr. Raymond lacked standing to create jurisdiction in the Colorado Supreme Court. 518 P2d 286 (1974). As of this date, *Raymond* was the only reported state court opinion which had specifically followed *Wardius.* Subsequent to the date on which the instant case was decided, 1974 PA 63, §§ 20, 21, amending MCLA 768.20; MSA 28.1043 and MCLA 788.21; MSA 28.1044, was enacted. As of

We have carefully considered other issues raised by defendant including the method of selecting the jury, defendant's arrest without a warrant, denial of defendant's motion for a separate trial on the issue of insanity, the propriety of jury instructions on insanity, and related matters. As to each, we have found no deviation from sound and accepted trial procedure or established case law.

Affirmed.

All concurred.

---

May 1, 1974, the effective date of the above act, a defendant filing a notice of alibi or insanity defense is entitled to receive a notice of rebuttal from the prosecuting attorney. That notice is to contain the names of the witnesses whom the prosecutor intends to use to rebut defendant's defense, and the prosecutor's failure to file such a notice will preclude the prosecutor from offering the testimony of those witnesses to rebut the defense.