*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

TERRY LOUIS WORD,

       Defendant-Appellant.

UNPUBLISHED
July 22, 2021

No. 352859
Washtenaw Circuit Court
LC No. 19-000489-FH

Before: FORT HOOD, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

A jury convicted Terry Louis Word of third-degree criminal sexual conduct (CSC-III), MCL 750.520d(1)(c) (sexual penetration with a mentally incapable person). The trial court sentenced him, as a fourth habitual offender, MCL 769.12, to 16 to 24 years' imprisonment. Word contends that the trial court erroneously admitted lay opinion evidence and raises several other challenges to his convictions. Although the opinion of a forensic interviewer was improperly admitted, the evidence was cumulative of properly admitted testimony and therefore harmless. We affirm.

## I. BACKGROUND

On September 17, 2018, YB, who was 38 years old, worked her usual shift as a courtesy clerk or grocery bagger at Kroger from 2:00 to 6:00 p.m. After finishing her shift, YB waited at the bus stop when Word pulled up and offered her a ride. YB was familiar with Word because he worked at a restaurant across the street from Kroger and he would go through YB's checkout line at work, deliver food to her home, and call her home asking to speak with her. YB's mother rebuffed those efforts, instructing him to "basically stay away from her."

YB got inside Word's vehicle and he took her to his home. YB was watching the news on Word's bed when Word told her to take off her clothes. YB complied, but she told Word that she did not "want to do this" and that she wanted to put her clothes back on. Word grabbed something from a drawer, removed his pants, and got on top of YB. He then penetrated YB's vagina with his penis for an unspecified time. When he finished, YB wanted to go home because she thought that her mother might be concerned. YB, though 38 years old, had lived with her mother, Direcie

Burrell, almost her entire life, and Burrell served as YB's guardian. Word, however, declined to take YB home that night.

Worried because YB had always come home after work, Burrell contacted the police. Initially the police were hesitant to investigate YB's disappearance because of her age, but after Burrell shared that YB had a mental disability, the police entered YB's information into the Law Enforcement Information Network (LEIN) as a missing endangered person and unsuccessfully searched for her that night.

The next day, Word dropped off YB for her shift at Kroger, and after YB punched in, her manager, Ana Rodrigeuz, asked her about her whereabouts the night before. Rodrigeuz then informed YB's mother and the police that YB had showed up for her shift, and the police came to the store to talk to her. The police also spoke to Word that day, and he confirmed that YB had been with him. When the police mentioned that YB was cognitively impaired, Word responded that YB "seemed fine."

The next day, Burrell took YB to the hospital to see a sexual assault nurse examiner, and on October 3, 2018, the police scheduled a forensic interview for YB at the Washtenaw Child Advocacy Center. Word was eventually charged with and convicted of CSC-III under the theory that YB was mentally incapable of consenting to sexual penetration. He now appeals.

## II. LAY WITNESS TESTIMONY

Word argues that the admission of Burrell's testimony that YB was cognitively impaired amounted to plain error, and that the trial court abused its discretion by permitting a forensic interviewer, Elizabeth Smith, to testify that YB was cognitively impaired. Burrell's testimony was properly admitted under MRE 701 as a lay witness opinion. Although the prosecutor characterized Smith as a lay witness, the record belies the prosecutor's representation. The prosecution portrayed Smith as an expert by referring to her as a "forensic" examiner, by eliciting her extensive educational and experiential qualifications, and by presenting her as a person qualified to assess YB's mental capacity. The circuit court abused its discretion by admitting her testimony. Nevertheless, the evidence Smith presented was harmless.

We review for an abuse of discretion the trial court's admission of evidence. *People v Duenaz*, 306 Mich App 85, 90; 854 NW2d 531 (2014). "An abuse of discretion occurs when a trial court's decision is outside the range of principled outcomes." *Id*. However, we review for plain error unpreserved claims "affecting a defendant's substantial rights." *People v Jackson*, 292 Mich App 583, 592; 808 NW 541 (2011). Defendants must meet the following three requirements to establish plain error: "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). Additionally, even if the "defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse" because "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (cleaned up).

Because Burrell and Smith were not qualified as experts, MRE 701 governs the admissibility of their testimonies. MRE 701 provides that a lay "witness'[s] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." An expert is a witness qualified "by knowledge, skill, experience, training, or education," and who "may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." MRE 702. A lay witness's testimony must not derive from "scientific, technical, or other specialized knowledge," the standard foundation for expert testimony under MRE 702. See *People v Dobek*, 274 Mich App 58, 77; 732 NW2d 546 (2007).

## A. BURRELL'S TESTIMONY

On direct examination, Burrell testified that YB was 38 years old and had always lived with her. Burrell described that YB had attended special education classes throughout school, and characterized YB's disability as related to her memory and a need for frequent reminders about daily tasks.

After Burrell shared that initial information, the prosecutor stated, "I think you said to me before that she was cognitively impaired." Burrell responded, "Yes, I would say yes." Defense counsel did not object to the exchange. However, counsel began his cross-examination by leading Burrell to admit that she was not a physician, psychiatrist, or psychologist.

As a lay witness, Burrell was qualified to give her opinion that YB had a cognitive impairment. MRE 701 has two prongs, and Burrell's testimony satisfied both. First, the testimony is limited to "opinions . . . which are . . . rationally based on the perceptions of the witness." Second, any opinion expressed must be "helpful to . . . the determination of a fact in issue." Burrell's testimony was rationally based on her perception of YB. Burrell is YB's mother and YB had lived with her for approximately 38 years. Burrell was familiar with YB's school experiences and the challenges that YB faced in performing normal activities of daily life.

Burrell was qualified to opine regarding YB's cognitive abilities. Lay witnesses have long been permitted to offer opinions regarding a person's sanity. In *People v Cole*, 382 Mich 695, 707; 172 NW2d 354 (1969), the Supreme Court declared: "It is an almost universally accepted doctrine that the right to express an opinion as to sanity, or insanity, where it is at issue, is not confined to the experts." See also *United States v Lawson*, 653 F2d 299, 303 (CA 7, 1981) ("There is no question that the Government (or the defense, for that matter) may introduce lay testimony on the issue of sanity."). In *Cole*, our Supreme Court included a person's "mental competency or incompetency" as appropriate subjects for lay opinion testimony, with the caveat that the witness must establish that he or she had more than a snapshot of exposure to the person at issue:

> Before a lay witness is permitted to state an opinion regarding the sanity or insanity or mental competency or incompetency of a person whose mental condition is at issue, the witness must have had ample opportunity to observe the speech, manner, habits, or conduct of the person. To render himself competent under this rule, the witness must establish he was sufficiently acquainted with the

defendant or testator so as to testify to mental condition on a comparative basis and not merely to some manifested idiosyncrasy or eccentric behavior. The foundation to be laid in such case must indicate that the conclusions of the witness bear directly upon the issue of sanity and not merely conclusions of fact as to defendant's conduct. [*Cole*, 382 Mich at 710 (cleaned up).]

Accordingly, we reject Word's argument that Burrell was precluded from testifying to her daughter's mental incapacity. This evidence was intended to help the jury assess whether YB was mentally incapable of consenting to her sexual encounter with Word. See MCL 750.520d(1)(c). And Burrell's testimony was not objectionable simply because it embraced "an ultimate issue to be decided by the trier of fact." MRE 704. The trial court did not err by allowing Burrell to express an opinion that YB was cognitively impaired.

## B. ELIZABETH SMITH

The prosecutor's direct examination of Smith began with Smith's testimony that she was a "contingency worker" at the Washtenaw Child Advocacy Center and worked part-time at the Lenawee Child Advocacy Center. The prosecutor inquired: "And how long have you been employed as a forensic interviewer?" Smith replied that she had worked as a forensic interviewer for 16 years. The prosecutor asked her to explain her "duties as a forensic interviewer," and Smith replied: "Primarily I conduct forensic interviews. I also write reports if needed, present if needed, and attend and work with . . . case review and the team as needed."

Next, the prosecutor asked about Smith's educational background. Smith responded: "I have a bachelor's degree in psychology and pre-law from Michigan State University. And, a master of science in criminal justice from Michigan State University." Unprompted, she continued: "And I've attended oh probably between 40 and 45 trainings that have to do with memory and suggestibility, linguistics, I'm trying to think forensic interviewing itself and just questioning tactics." The prosecutor followed up by asking Smith "what is the forensic interviewing protocol?" Smith replied: "It's the protocol that Michigan follows, the entire state follows it, and it is mandated by anyone who does an investigative interview of a child and it consists of eight steps." Smith proceeded to detail the eight steps.

Smith explained that even though she interviewed YB, she typically did not interview 38-year-old women. When the prosecutor asked her why she interviewed YB, Smith responded, "I understood that she had some cognitive impairment and that's why we did the forensic interview."

Defense counsel objected, noting that the prosecutor had not admitted any expert testimony supporting that YB was cognitively impaired and arguing that Smith's conclusion was hearsay. In response, the prosecutor argued that she did not need an expert witness to testify that YB was cognitively impaired and that Smith's explanation of why she interviewed YB at her age was not hearsay. The trial court noted that Burrell had testified that YB was cognitively impaired, and it ruled that it would allow Smith's testimony because the court did not see a problem with it.

The prosecutor then asked Smith if she understood that she had received this case because YB had cognitive impairments, and Smith agreed that was the reason. Smith went on to explain

that she followed the forensic interview protocol with YB and that during the interview, YB giggled a lot and gave very literal and somewhat brief answers to her questions.

The prosecutor followed up, "And, in your opinion, I know ma'am you're not an expert, did she seem impaired, cognitively impaired?" Defense counsel objected again arguing that Smith could not give her opinion because she was not an expert, but the trial court allowed it, reiterating that Burrell had already testified "in the general sense, not in any scientific diagnosis" that YB had a cognitive impairment. Smith then responded affirmatively to the prosecutor's question.

The prosecutor next asked Smith to describe YB's "characteristics" during the interview. Smith recounted that during the rapport building stage, she simply talked to the interviewee to get a feel for how he or she answered questions. In this case, YB took her time answering questions, and her speech was not as precise as Smith would have anticipated for an adult woman.

On cross-examination, defense counsel had Smith admit that she was not a physician, psychiatrist, or psychologist and that she could not diagnose people with mental illnesses or cognitive disabilities.

The distinction between lay opinion testimony and expert testimony is not always readily apparent. While generally a witness may offer lay opinion testimony based on the witness's first-hand perceptions, context matters. Smith was not a casual observer, a coworker, or a family member. Rather, within the first moments of her testimony the prosecution repeatedly highlighted that Smith was a "forensic" interviewer. The term "forensic" suggests that Smith was an expert retained for the purpose of courtroom testimony. *Black's Law Dictionary* (11th ed) defines "forensic" as "[u]sed in or suitable to courts of law or public debate;" and alternatively as "[o]f, relating to, or involving the scientific methods used for investigating crimes." Smith's description of her education and experience solidified that she was not testifying merely as an observer of YB, but as a witness who brought to the task of a special interview, conducted in a "forensic" setting, "specialized knowledge" based on her "knowledge, skill, experience, training, or education." MRE 702.

By presenting Smith as a "forensic" expert with an educational background in psychology, "pre-law" and criminal justice, the prosecutor conferred on Smith an "aura of special reliability and trustworthiness" commensurate with that of an expert. *People v Murray*, 234 Mich App 46, 55; 593 NW2d 690 (1999) (cleaned up). Smith was invited to examine YB precisely because she brought to the task a specialized background and a wealth of experience. When asked "the purpose" of the interview she conducted with YB, Smith referenced "hypothesis testing" and "protecting the rights of the accused"—the verbal currency of an expert in her field. Her interaction with YB was the antithesis of that of a casual, lay observer of human behavior:

> The purpose is two-fold. It is child-centered and it's also hypothesis testing which is evidence based. So, we put the person I speak with first. Their needs are to come first before everything else. And, hypothesis testing is we are looking at various possibilities of what might have happened other than what originally came in. And, it has two primary facets. One is that it's child led or the person I would be speaking to in this case, leads it. I allow her to talk and I don't override her or him as the case might be. And, it is also to protect the rights of accused. That's

one of the primary reasons it has been designed the way that it has been. [10/21 Tr, pp 247-248.]

By admitting Smith's testimony under MRE 701, the trial court blurred the distinction between the specialized knowledge of an expert, and the rational perceptions of a lay witness.[1] Smith's opinions constituted expert testimony in disguise. As such, they were improperly admitted because the prosecution failed to lay a proper foundation for Smith's expert testimony, and the trial court failed to exercise its gatekeeping powers. See *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004) ("MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data.").

Despite the trial court's error in allowing Smith to testify as a lay witness, the evidence she presented was harmless in light of abundant and properly admitted evidence of YB's mental capacity.[2] When assessing preserved, nonconstitutional error, we consider whether absent the error, it is "more probable than not" that a different outcome would have resulted. *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). "The object of this inquiry is to determine if it

---

[1] FRE 701 was amended in 2000 to add the requirement that lay opinion testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." MRE 701 has not been similarly amended. The Advisory Committee Note to the federal rule explains:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness'[s] testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. See generally *Asplundh Mfg Div v Benton Harbor Engineering*, 57 F3d 1190 (CA 3, 1995). By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in FR Civ P 26 and FR Crim P 16 by simply calling an expert witness in the guise of a layperson. *See* Joseph, *Emerging Expert Issues Under the 1993 Disclosure Amendments to the Federal Rules of Civil Procedure*, 164 FRD 97, 108 (1996) (noting that "there is no good reason to allow what is essentially surprise expert testimony." and that "the Court should be vigilant to preclude manipulative conduct designed to thwart the expert disclosure and discovery process").

Courts considering the 2000 amendment have concluded that it did not substantively change FRE 701, but merely clarified its application. See *United States v Garcia*, 291 F3d 127, 139 n 8 (CA 2, 2002); *People v Stewart*, 55 P3d 107, 123 n 10 (Colo, 2002).

[2] Although trial counsel's objection could have been stated more clearly, we construe it as an objection to Smith's testimony under MRE 701.

affirmatively appears that the error asserted undermines the reliability of the verdict." *Id*. (cleaned up).

YB's mother testified extensively regarding YB's cognitive disability, and because YB testified at length, the jury had an opportunity to make its own assessment. YB had been in special education throughout her schooling, did not drive, had a guardian, and had never before failed to come home after work. Her supervisor at Kroger testified that YB began working at the store two decades ago as part of an employment program for children with mental disabilities. She described YB as capable of very simple tasks and that she required specific instructions and repetition. In contrast, Smith's testimony was brief and not particularly compelling. And it bears emphasis that the jury is empowered to make its own determination of mental capacity. The improper admission of Smith's opinions did not undermine the reliability of the verdict, and therefore does not merit relief.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Word next argues that he was denied effective assistance of counsel because defense counsel failed to object to Burrell's testimony that YB was cognitively impaired. However, because Burrell's testimony was unobjectionable, defense counsel's effort would have been futile, and the failure to make a futile objection does not amount to ineffective assistance of counsel. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

## IV. SUFFICIENCY OF THE EVIDENCE

Finally, Word argues that the prosecution presented insufficient evidence to support his CSC-III conviction. Specifically, he notes a lack of evidence that YB was mentally incapable.

We review de novo challenges to the sufficiency of the evidence, viewing the evidence in the light most favorable to the prosecution to determine whether the evidence was sufficient for a trier of fact to find that the prosecution proved the crime's essential elements beyond a reasonable doubt. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *Carines*, 460 Mich at 757 (cleaned up).

MCL 750.520d(1)(c) provides that a defendant is guilty of CSC-III when he sexually penetrates the victim, and "knows or has reason to know that the victim is mentally incapable, mentally incapacitated, or physically helpless." Pursuant to MCL 750.520a, "mentally incapable" means that the victim "suffers from a mental disease or defect that renders that person temporarily or permanently incapable of appraising the nature of his or her conduct."

The statutory language contained in MCL 750.520a encompasses "not only an understanding of the physical act but also an appreciation of the nonphysical factors, including the moral quality of the act, that accompany such an act." *People v Breck*, 230 Mich App 450, 455; 584 NW2d 602 (1998). "This conclusion is bolstered by this Court's prior indications that the rationale behind the statutes prohibiting sexual relations with a mentally incapable person is that such a person is presumed to be incapable of truly consenting to the sexual act." *Id*.

In addition to her earlier noted testimony, at trial Burrell testified that YB was unable to drive and did not have a driver's license. She was forgetful and needed reminders to complete daily tasks like putting on clean clothes and brushing her teeth, and was unable to handle the responsibility of a doctor's appointment despite understanding that medical appointments were something that people attended. Burrell expressed that it took "a lot of educating for many, many years to get" YB to where she was, and she had made progress and improved with time. She also testified that YB had always lived with her except for one month in which YB attempted to live with other young adults through a program.

Rodrigeuz also testified about her experience with YB. She explained that YB had worked at Kroger, mostly as a courtesy clerk, for over 21 years. The state of Michigan ran a program with YB's high school in which local businesses extended employment opportunities to students with mental disabilities. A liaison from YB's school reached out to Kroger about its opening for a courtesy clerk, and Rodrigeuz invited YB to apply. YB completed Kroger's application with the assistance of the school liaison, and Rodrigeuz interviewed YB and offered her the position. After YB started working at Kroger, she had a job coach who trained and shadowed her for the first month or two and who would then periodically check on her.

Rodrigeuz described YB as "happy-go-lucky" and "a great employee" who enjoyed working at Kroger and talking to customers, and she described YB's employment as ritualistic because she always worked the same shift and took the same break. The other Kroger employees ensured that YB understood her assignments, and they always followed up with her. For example, when Rodrigeuz asked YB to put a grocery item back on the shelf, she would check to ensure that YB had actually done so. Rodrigeuz also testified that sometimes she had to explain or ask YB to do a task more than once and that YB was always given simple tasks with very specific instructions. When she gave YB very detailed instructions, YB was able to do exactly as directed.

Christy Stanley, the assistant customer service manager at Kroger who directly oversaw YB, also testified at trial. She confirmed that YB was a courtesy clerk and that her main responsibility was bagging groceries. Stanley preferred to have YB perform the same task because YB struggled with new tasks. For example, if Stanley asked YB to put milk back on the shelf, it would take YB "a second to register" the request and then Stanley would have to follow up with her to make sure that she put the milk in the right spot. Stanley also indicated, however, that even if YB was not completing a new task, she needed instructions more than once. Stanley had YB bag groceries because YB knew the directions for how to bag. However, Stanley still needed to remind her to not use too many bags or to not put too many groceries in one bag. Stanley also believed that YB was incapable of working a cash register.

Jill Mitchell, the nurse who performed YB's physical examination, testified that before she conducted YB's examination, she had Burrell view the examination room and then she and YB walked Burrell to a chair outside the room, so YB knew where her mother was and knew that her mother knew where she was. When Mitchell began to perform YB's exam, she offered to let Burrell come into the examination room with them because she was YB's guardian and YB was fearful and wanted her mother. Mitchell also testified that "things were slowed down" for YB and that YB struggled to get words out and was childlike.

YB's physical exam "took quite a bit of extra time" because YB repeatedly sat up and stated, "I don't know about this." It took time for YB to become comfortable and for Mitchell to address YB's fear that she would hurt her. However, YB seemed to eventually understand her. At the end of the exam, Mitchell gave YB a shot to which YB responded "owie" and started crying. Mitchell had to rub YB's arm in response. She did not find YB's actions developmentally appropriate. Mitchell also testified that on the form she completed for YB's exam, she noted that YB did not know about ejaculation.

YB also testified at trial, reiterating that she lived with her mother her entire life, that she did not have a driver's license, and that she had bagged groceries at Kroger for approximately 21 years. Additionally, during her testimony, YB described her sexual encounter with Word. After she testified that Word grabbed something from the drawer and removed his pants, she had the following exchanges with the prosecutor:

> *Q*. And, what happened next?
>
> *A*. Then he got on top of me. He got on top of me because I was—I was movin' but I like I'm like first—everything was hurting like my leg, then my neck, I was—I was just in pain. I want to say in pain. That's what I wanted to say, I was in pain. That's what I wanted to say, I was in pain. That's what I wanted to say, I was in pain.

* * *

> *Q*. What was his body doing on top of your body?
>
> *A*. I was movin' but I don't know—I don't know how long I was movin' for so I—I don't know how long I was movin' for. I don't—I don't know that. I don't know how long I was movin' for when it happened. I don't know how long I was movin'.
>
> *Q*. When what happened?
>
> *A*. When—when he was on top of me. I don't know how long this—I don't know. I don't know how long it—I don't know how long it was.
>
> *Q*. And why—why were you moving?
>
> *A*. Hm?
>
> *Q*. Why were you moving?
>
> *A*. I was—I was feelin' pain. I was feelin' pain, you know, at the time when—when this happened. I could—I—I want to say I couldn't stand still. I couldn't stand still. I couldn't stand still. I couldn't stand still.
>
> *Q*. Okay. Was his body touching your body?
>
> *A*. Yes, yeah. Yeah.

*Q*. And what part?

*A*. I want to say—I want to say the front—the front, mainly the front, the front, the front, the front part.

* * *

*Q*. And, do you know any other name for a man's private part or a boy's private part?

*A*. It's called penis right? If I—if I—if I'm sayin' it right, I don't know if I'm sayin' it right.

*Q*. Did his penis touch your body?

*A*. It went below, below.

*Q*. And it went below. It went what part of your body?

*A*. It went inside my vagina I want to say. Yeah.

*Q*. His penis went inside your vagina?

*A*. Yes. Yeah.

* * *

*Q*. Did you understand what was happening?

*A*. Yeah, I—yeah I—but it—it just made me—it just make me upset. It just—it just, you know, it just—it just happened. It make me upset though. It didn't—it made me upset for a little while when this happened. It make me upset for a little while. It made me upset. It made upset, so that's how I felt. That's how I felt. That's all.

* * *

*Q*. And, did he take you back home?

*A*. No, 'cause I wanted—I want—I want—I do want to go home, I do because my mom might be like concerned. You know—you know how parent— you know how parents are. They be—they be concerned 'bout they child and that's you know—parents got every right to be concerned 'bout they child. You know, they've got every right, you know. You can't—you can't take that away. They got—they got every right, you know. They got every right.

Viewing the evidence in the light most favorable to the prosecution, the prosecution presented evidence sufficient for the jury to find that YB was mentally incapable beyond a reasonable doubt. See *Meissner*, 294 Mich App at 452. The evidence clearly showed that YB had

a mental disease or defect. Her mother testified that she was YB's guardian and that YB had a mental disability and cognitive impairment in the sense that she had trouble completing daily tasks, she was forgetful, unable to drive, and attended special education classes in school. Although she worked at Kroger for two decades, she received the position through a program intended to provide employment opportunities to students with mental disabilities, and throughout her employment, YB remained a grocery bagger because, as both Rodrigeuz and Stanley noted, YB struggled to complete new tasks. The only reason that the police were willing to enter YB's information into LEIN and search for her the night that she went missing was her disability. Mitchell described YB's behavior during her physical exam as fearful and childlike, and testified that YB's actions were not developmentally appropriate. Furthermore, YB's own testimony at trial corresponded with what the other witnesses testified to at trial.

However, to satisfy the definition of "mentally incapable" a victim must not simply suffer a mental defect or disease, the disease or defect must render the victim "temporarily or permanently incapable of appraising the nature of his or her conduct," MCL 750.520a, which this Court has interpreted to encompass both the victim's understanding of the act and appreciation of the sexual act's nonphysical factors. *Breck*, 230 Mich App at 455. The jury could have inferred simply from the testimony regarding YB's mental disability that she was unable to appraise the nature of what occurred with Word. See *Carines*, 460 Mich at 757. Furthermore, there was direct evidence that plaintiff was unable to understand the physical act and appreciate the act's nonphysical factors. For example, Mitchell testified that YB did not know about ejaculation. Additionally, even though YB stated that she understood what was happening, the rest of her testimony, what she said and how she said it, was sufficient for a rational jury to infer that YB was unable to appraise the nature of her conduct. YB repeatedly described what occurred between her and Word in terms of pain and as her not being able to "stand still" and "moving." She was unsure of the name of Word's private part, and when asked where Word's body was touching her body, her answer was "the front part." When pushed on where Word put his penis, she responded, "It went inside my vagina I want to say."

Viewing the evidence in the light most favorable to the prosecution, ample evidence supported that YB was mentally incapable. See *Meissner*, 294 Mich App at 452.

We affirm.

/s/ Karen M. Fort Hood
/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher

-11-